**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SOLISHUM SUMER SHIELDS, | : | |
| *Plaintiff*, | : | CIVIL ACTION |
| | : | |
| v. | : | No. <u>20-2999</u> |
| | : | |
| RYAN WIEGAND, *et al.*, | : | |
| *Defendants*. | : | |

**<u>MEMORANDUM</u>**

**Jones, II   J.**                                                    **September 29, 2022**

**I.     INTRODUCTION**

Solishum Sumer Shields (hereinafter "Plaintiff") commenced this action on June 9, 2020

against Officer Ryan Wiegand and East Lampeter Township (hereinafter "Moving

Defendants").[1]  After some initial proceedings, Plaintiff was permitted to file an Amended

Complaint on April 5, 2021, in which he asserts multiple claims against Moving Defendants for

violations that allegedly occurred during the course of a police pursuit and subsequent arrest.  In

response, Moving Defendants filed the present Partial Motion to Dismiss (hereinafter "Motion"),

which lists several reasons for dismissal, including that: Plaintiff's claims relating to the police

pursuit fail to show that Defendant Officer Wiegand had the requisite intent for a substantive due

process claim; any alleged Eighth Amendment violations are inappropriate because these are

reserved for after an individual has received process; and any allegations against the Township

---

[1] Though there are multiple other individuals who were later served throughout the life of this case, the present Motion to Dismiss has only been submitted on behalf of the named Moving Defendants.  Thus, the other listed defendants are not relevant for purposes of the present opinion and will not be considered further.

fail to meet the standard necessary to charge a municipality.[2]  For the reasons stated herein, Moving Defendants' Motion is granted in its entirety.

## II.    FACTUAL BACKGROUND[3]

### A.  The Vehicle Pursuit

On or about December 2, 2019, at approximately 11:55 p.m., Plaintiff was driving on Lincoln Highway in Lancaster, PA, when an unmarked vehicle with its headlights turned off began following him.  Am. Compl., ECF No. 40, ¶ 1.  The driver of this vehicle was Defendant, Officer Ryan Wiegand.  Am. Compl. ¶ 1.  Plaintiff claims he was driving the speed limit and not driving erratically.  Am. Compl. ¶ 2.  Whenever Plaintiff would switch lanes, the unmarked vehicle followed.  Am. Compl. ¶ 3.  Because this behavior and the fact that it was nearly midnight made Plaintiff feel threatened, he passed through a traffic light while the other vehicle stopped at the red light.  Am. Compl. ¶¶ 4-5.  At the next traffic stop, Plaintiff was stopped at a red light when the unmarked vehicle pulled up next to him and put on their headlights.  Am. Compl. ¶ 6.  When the traffic light turned green, Plaintiff claims that he tried to let the other vehicle pass him, but the car positioned itself behind Plaintiff and turned-on flashing police lights.  Am. Compl. ¶¶ 7-9.

---

[2] In Plaintiff's Response in Opposition (hereinafter "Response") (ECF No. 84) to Moving Defendants' Motion, he appears to allege in the first instance that Officer Wiegand subjected him to intentional infliction of emotional distress (hereinafter "IIED").  Resp. 69.  However, Plaintiff does not raise such as a cause of action in his Amended Complaint.  In analyzing Plaintiff's Amended Complaint, "Federal Rule of Civil Procedure 8(a) sets out general pleading standards and requires 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *RAH Color Techs. LLC v. Ricoh USA Inc.*, 194 F. Supp. 3d 346, 348 (E.D. Pa. 2016) (quoting Fed. R. Civ. P. 8(a)(2)).  Even a liberal reading of the *pro se* Plaintiff's Amended Complaint fails to put Moving Defendants on notice of an IIED claim.  Should Plaintiff wish to bring IIED charges, he must move for this Court's approval to further amend his Amended Complaint.  Without such, any alleged IIED claims cannot be considered further for purposes of the present Motion.

Because Plaintiff never included such a claim in his Amended Complaint, Moving Defendants were not put on notice to ever respond to this allegation.  The Court will, thus, not consider the point further for purposes of the present Opinion.

[3] At the motion to dismiss phase, the Court must accept all factual allegations as true and construe the Amended Complaint in the light most favorable to Plaintiff.  *Pittsburgh Mack Sales & Serv., Inc. v. Int'l Union of Operating Eng'rs, Local Union No. 66*, 580 F.3d 185, 192 (3d Cir. 2009).  Unless an exception exists, the Court may not consider matters beyond the scope of the pleadings at this stage of the proceedings.

Despite seeing these lights, Plaintiff kept driving[4] to look for a public space with witnesses because he claims he felt threatened.  Am. Compl. ¶¶ 9-11.  Plaintiff explains that he felt threatened because Officer Wiegand drove in an aggressive and reckless manner, despite the weather conditions being a mix of rain and snow.  Am. Compl. ¶¶ 12-13.  With the weather and the darkness, Plaintiff decided to turn off Lincoln Highway and onto a back road to avoid any collisions.  Am. Compl. ¶ 14.

Plaintiff further claims his car's master cylinder for the brakes malfunctioned, so even when Plaintiff attempted to slow down or stop his car, it would barely do so.  Am. Compl. ¶ 16. Due to his brakes malfunctioning and the fact that Officer Wiegand did not allow a safe distance, Plaintiff was unable to turn his car, despite putting on his turn signals.  Am. Compl. ¶ 18.  After about fifteen (15) minutes of the pursuit, Officer Wiegand allegedly attempted to crash Plaintiff's car by almost forcing him into a head-on-collision with a bulldozer.  Am. Compl. ¶ 19.

Approximately half an hour after the chase began, Plaintiff states that two (2) police vehicles set up spike strips that blew out and deflated his tires.  Am. Compl. ¶¶ 20-21.  As his vehicle began to slow down, Plaintiff alleges that a police vehicle marked J1-22 drove directly in front of his car and slammed on its brakes, attempting to crash Plaintiff's car into its bumper. Am. Compl. ¶¶ 22, 24.  Though Plaintiff was able to avoid hitting the rear of J1-22 a few times, J1-22, eventually, drove parallel to Plaintiff's car and drove into Plaintiff's driver-side door multiple times to try to attempt to crash his car into telephone poles.  Am. Compl. ¶ 26.  As

---

[4] Plaintiff later pled guilty to multiple violations of the criminal code, including fleeing, or attempting to allude a police officer, pursuant to 75 P.S. 3733(a).  *See* Pl's Criminal R, attached to Mot. as Exhibit A.  Because the criminal pleadings are matters of public record, the Court may take judicial notice of this fact.  *See Easterling v. Perez*, No. 16-CV-4463, 2017 WL 3610484, at *3 (D.N.J. Aug. 22, 2017) (citing *Sands v. McCormick*, 502 F.3d 263, 293 (3d Cir. 2007)) ("Matters of public record have been limited to criminal case dispositions such as convictions or mistrials, letter decisions of government agencies and published reports of administrative bodies.").

Plaintiff approached a 4-way intersection, J1-22 crashed into Plaintiff's vehicle three (3) times, causing him to spin out.  Am. Compl. ¶ 28.

### B.  Pursuit on Foot and Subsequent Arrest

At this point, Plaintiff exited his vehicle and began to run away.  Am. Compl. ¶ 29. Plaintiff stopped when his shoe fell off, causing him to fall, and Officer Wiegand shot him with a taser.  Am. Compl. ¶ 30.  After Plaintiff fell, he alleges that multiple officers seized him, picked him up, and slammed him onto his knees, hands, chest, and face.  Am. Compl. ¶ 31.  Plaintiff admits that, initially, he resisted arrest because his hands were under his body as he was kicked and punched by the officers.  Am. Compl. ¶ 32.  Eventually, Plaintiff was placed into handcuffs when he was tased again by Officer Wiegand.  Am. Compl. ¶ 33.  Plaintiff claims that Officer Wiegand tased him multiple times, taunting him by saying things like, "You ready?  Here it comes!"  Am. Compl. ¶ 34.

After Plaintiff was placed in handcuffs, he claims that he was kicked and punched in the head by the officers, and one grabbed him by his ponytail and slammed his face into the concrete.  Am. Compl. ¶¶ 35-37.  As a result of these beatings, Plaintiff sustained a concussion, head contusion, head swelling, two (2) black eyes, and injuries to his neck, legs, hands, and back. Am. Compl. ¶ 38.  He further states that other officers watched the beatings occur and did nothing to help.  Am. Compl. ¶ 39.

Because of his injuries, Plaintiff was transported to a hospital in Jennersville, PA, where he claims the police caused his medical records to be falsified so that they looked like they were caused by a motorcycle accident.  Am. Compl. ¶ 45.  Thereafter, Plaintiff was transported to Chester County Prison in West Chester, Pa, where is currently serving his sentence in relation to this matter.  Am. Compl. ¶ 46.

Because of the officers' actions, Plaintiff now suffers from permanent migraines,[5] re-occurring vertigo, hypersensitivity to light and sound, anxiety, and has re-occurring nightmares and flashbacks.  Am. Compl. ¶¶ 47, 50.  Plaintiff further claims that he was charged for over $12,000 in hospital expenses, and his car was totaled.  Am. Compl. ¶ 51.

## III.    PROCEDURAL HISTORY

On June 9, 2020, Plaintiff filed suit in the Eastern District of Pennsylvania.  *See* Compl., ECF No. 2.  On November 12, 2020, the matter was placed in civil suspense while the Clerk of Court attempted to appoint counsel from the Court's attorney panel.  *See* Order from Nov. 12, 2020, ECF No. 19.  When no attorney took Plaintiff's case, he filed a Motion to Remove his Case from Civil Suspense (ECF No. 36) on March 24, 2021, which this Court granted that same day (ECF No. 37).  On March 26, 2021, Plaintiff sought leave to file an amended complaint (ECF No. 38), which this Court granted on March 29, 2021 (ECF No. 39).

On April 5, 2021, Plaintiff filed an Amended Complaint, asserting the following three (3) claims against Moving Defendants: (1) excessive force, illegal seizure of the Plaintiff's person, in violation of the Fourth Amendment, and a due process violation under the Fourteenth Amendment against Officer Wiegand (Count I); (2) an Eighth Amendment violation by Officer Wiegand (Count I); and (3) failure to inadequately train Officer Wiegand, in violation of 42 U.S.C. § 1983, against East Lampeter Township (Count IV).  On April 12, 2021, Moving Defendants filed the present Motion, putting forth the following arguments regarding the pursuit: (1) all claims involving the pursuit are appropriately analyzed under the Fourteenth Amendment's Due Process Clause and, concomitantly, must show that Officer Wiegand intended to harm Plaintiff; or (2) alternatively, if the Court finds that Plaintiff has plausibly

---

[5] Plaintiff is being treated for these migraines in prison with medication, but he claims he is unable to receive proper treatment in this facility.  Am. Compl. ¶ 47.

alleged a due process violation, Defendants argue that the law surrounding the pursuit was not so clearly established as to put Officer Wiegand on notice that his actions would violate the constitution.  Mot. 6-7.  Additionally, they argue that any Eighth Amendment arguments are inappropriate given the actions at issue occurred before Plaintiff was criminally charged, and the claims against the Township are insufficient as a matter of law for establishing liability.  Mot. 7, 30-31.

After receiving multiple extensions to file a Response to Moving Defendant's Motion, on May 3, 2021, Plaintiff filed a second Motion for Appointment of Counsel (ECF No. 63).  As a result, on May 7, 2021, the Court, again, placed the case in civil suspense and referred the matter to the Prisoner Civil Rights panel.  *See* May 7, 2021, Order, ECF No. 69.  When Plaintiff's case was, again, not chosen by an attorney, he filed a Motion to Remove the Case from Suspense Status (ECF No. 82), which the Court granted (ECF No. 83).  After returning to active status, Plaintiff filed his Response, where he argues that Officer Wiegand initiated a traffic stop for no reason and put more people in danger by continuing his pursuit, without a care if Plaintiff got hurt.  Resp. 8-12.  Plaintiff further argues that even if Officer Wiegand is not found to be liable, liability against the Township is possible because policy makers acted with deliberate indifference in developing an inadequate training program for officers.  Resp. 51.  With these filings, Defendant's Motion is ripe for the Court's review.

## IV.     STANDARD OF REVIEW

Rule 12(b)(6) provides for dismissal of a complaint, in whole or in part, for failure to state a claim upon which legal relief can be granted.  In deciding a motion to dismiss, "'[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'"  *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d

315, 318 (3d Cir. 2008) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).  While these claims do not require detailed facts, "a complaint must do more than allege the plaintiff's entitlement to relief."  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).  A complaint must "show" the plaintiff is entitled to relief.  *Id.* (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234-235 (3d Cir. 2008)).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Courts reviewing a motion to dismiss pursuant to Rule 12(b)(6) must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  *See Phillips*, 515 F.3d at 233 (quoting *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2008)); *see also Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).  In the Third Circuit, the Court's review "is normally broken into three parts: (1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged."  *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

Dismissal is appropriate when, even assuming all the plaintiff's claims are true, the plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  If a plaintiff does not "nudge [his/her] claims across the line from conceivable to plausible, [the] complaint must be dismissed."  *Id*.  However, because Plaintiff, here, is *pro se*, the Court is obligated to construe his "allegations liberally and apply a less stringent standard to [his] pleadings...than to a Complaint drafted by counsel."  *Perlberger v.*

*Caplan & Luber, LLP*, 152 F. Supp. 2d 650, 653 (E.D. Pa 2001).  *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Gibbs v. Roman*, 116 F.3d 83, 86 n.6 (3d Cir. 1997).

## V.    DISCUSSION

### A.  Plaintiff's Pursuit Claims against Officer Wiegand (Count I)

Plaintiff's Complaint states that Officer Wiegand's conduct during the pursuit constitutes a seizure and a violation of Plaintiff's Fourth Amendment rights.  *See* Am. Compl., Count I. Moving Defendants argue that all claims relating to the pursuit are, rather, appropriately analyzed under the Fourteenth Amendment's due process clause because pursuit does not inherently involve a seizure.  Mot. 13-14.  Having reviewed the filings and relevant caselaw, the Court agrees.

"[A] Fourth Amendment seizure [occurs]...when there is a governmental termination of freedom of movement through means intentionally applied."  *Scott v. Harris*, 550 U.S. 372, 381 (2007) (internal citation and quotation marks omitted).  *See also Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989) ("If...the police cruiser had pulled alongside the fleeing car and sideswiped it, producing the crash, then the termination of the suspect's freedom of movement would have been a seizure.").  On the contrary, the Third Circuit has held that where a patron does not submit to a police officer's show of authority, no seizure occurs.  *See United States v. Johnson*, 432 F. App'x 118, 121 (3d Cir. 2011) (affirming the District Court's conclusion that no seizure occurred when a police officer turned on his lights and sirens, but the suspect continued to drive away, commencing a police chase).  *See also Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845 n.7 (1998) ("Attempted seizures of a person are beyond the scope of the Fourth Amendment.").  Here, Plaintiff still did not come to a stop even after J1-22 crashed into his car three (3) times, causing him to spin out because Plaintiff continued the chase on foot.  In fact, Plaintiff admits

that he only came to a stop after falling over his shoe, about the same time Officer Wiegand

tased him.  Such cannot constitute a seizure because Plaintiff, ultimately, stopped because of his

fall, not because the authority of the law made him.  *See California v. Hodari D.*, 499 U.S. 621,

629 (1991) ("[A]ssuming that [the officer]'s pursuit in the present case constituted a 'show of

authority' enjoining Hodari to halt, since Hodari did not comply with that injunction he was not

seized until he was tackled."); *United States v. Terry*, 565 F. Supp. 3d 658, 663 (W.D. Pa. Oct. 4,

2021) (holding that no seizure occurred in a police chase where the fleeing suspect crashed into a

fence because "the officers' show of authority did not produce the stop; the law of physics did.").

Satisfied that the pursuit did not constitute a seizure, the Court will consider Plaintiff's claims

relating to it under the Fourteenth Amendment's due process clause, specifically, as a state-

created danger.

      The state-created danger theory "embodies the principle that the government has an

obligation under the Fourteenth Amendment's Due Process Clause 'to protect individuals against

dangers that the government itself creates.'"  *Sauers v. Borough of Nesquehoning*, 905 F.3d 711,

717 (3d Cir. 2018) (quoting *Haberle v. Troxell*, 885 F.3d 170, 176 (3d Cir. 2018)).  Generally

speaking, "[w]here a municipal officer is alleged to have engaged in abusive action, 'only the

most egregious official conduct can be said to be arbitrary in the constitutional sense.'"  *Koreny

v. Smith*, No. 17-CV-371, 2018 WL 1141513, at *5 (W.D. Pa. Mar. 2, 2018) (quoting *Lewis*, 523

U.S. at 847-49 & n.8).  In making this determination, courts consider the following four (4)

elements:

    (1) [T]he harm ultimately caused was foreseeable and fairly direct;

    (2) a state actor acted with a degree of culpability that shocks the conscience;

    (3) a relationship between the state and the plaintiff existed such that the plaintiff was a
        foreseeable victim of the defendant's acts, or a member of a discrete class of persons

> subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* (quoting *Haberle*, 885 F.3d at 176-77). In the present action, Moving Defendants suggest that Plaintiff's Amended Complaint lacks any indication that Officer Wiegand's conduct "shocks the conscience," so the Court's present analysis will focus on this second element.

"The level of culpability required to 'shock the contemporary conscience' falls along a spectrum dictated by the circumstances of each case." *Id.* (quoting *Lewis*, 523 U.S. at 847-49 & n.8). In cases where actions are in a "'hyperpressurized environment,'" they do not shock the conscience unless the officer has the "'intent to cause harm.'" *Id.* (quoting *Haberle*, 885 F.3d at 177). When actions are taken with "'hurried deliberation,'" those that "'reveal a conscious disregard of a great risk of serious harm'" shock the conscience. *Id.* (quoting *Haberle*, 885 F.3d at 177). Lastly, when an officer makes a decision with "'unhurried judgment[ ],'" and with time for "'careful deliberation,'" those that are "'done with deliberate indifference'" have been found to shock the conscience. *Id.* (quoting *Haberle*, 885 F.3d at 177).

In this case, Moving Defendants argue that because Plaintiff was actively fleeing from police (both by car and then by foot), the Court should analyze Officer Wiegand's actions under the "intent to cause harm" given the immediacy the situation required. Mot. 23-24. In *Sauers*, the Court found that the appropriate level of culpability was "hurried deliberation" when a suspect was *not* actively fleeing from the police and had only conducted a simple traffic violation. 905. F.3d at 718. On the contrary, when a suspect *is* actively fleeing from the police,

the Supreme Court in *Lewis*[6] held that "high-speed chases with no *intent to harm* suspects physically or to worsen their legal plight do not rise to liability under the Fourteenth Amendment[.]"  *Lewis*, 523 U.S. at 834 (emphasis added).

Applying *Lewis*'s guidance to a case with similar facts to the case at bar, the Third Circuit in *Davis v. Twp. of Hillside* granted summary judgment for plaintiff's substantive due process claim, despite police officer's ramming into the plaintiff's car to put an end to a high-speed chase.  190 F.3d 167, 171 (3d Cir. 1999).[7]  The Court reasoned that "*Lewis* does not permit an inference of intent to harm simply because a chase eventuates in deliberate physical contact causing injury."  *Id.*  Rather, "[t]hat physical contact of some sort between the pursued and pursuing vehicles might occur in the course of a high-speed chase, particularly at its conclusion, is foreseeable."  *Id.*  Accordingly, without more, the actions described by the

---

[6] Notably, the facts prompting the filing of the *Lewis* case are tragic, involving an eighteen (18) year old driving a motorcycle at a high speed with a sixteen (16) year old passenger on the back.  523 U.S. at 836.  When two (2) police officers saw this, one officer, Smith, turned on his car's sirens and flashing lights and yelled at the boys to stop; instead, the motorcycle maneuvered between the police cars and sped off.  *Id.* at 836-37.  Smith then made a quick turn in his car and began pursuing the boys at high speeds, reaching up to 100 miles per hour and getting as close to the boys as 100 feet.  *Id.* at 837.  For 75 seconds, and over the course of 1.3 miles, the chase ensued through a residential neighborhood.  *Id.*  The chase ended when the motorcycle attempted to make a sharp turn but tipped over; though the driver was able to get out of the way, Smith's police vehicle could not stop in time and skidded directly into the sixteen (16) year old passenger, sending him nearly seventy (70) feet down the road and killing him. *Id.*  Despite the severity of the injuries suffered, the Supreme Court still could not find that Smith had violated the decedent's substantive due process rights because the decedent's estate failed to show that Smith had any intent to harm the teenage victim.

[7] The facts leading to the filing of *Davis* involved a stolen vehicle driving in a residential neighborhood when police officers in two (2) patrol cars noticed the car stop in a traffic lane at a stop sign for what they considered to be an unusually long amount of time.  190 F.3d at 169.  When the officers saw that there was also damage to the rear of the vehicle, they decided to investigate with one of the police cars moving next to the vehicle to pull it over while the other officer ran the car's license plates.  *Id.*  At this point, the stolen vehicle turned out of the intersection, and despite one of the police car's putting their flashing lights on, the stolen car sped away.  *Id.*  The police pursuit reached speeds of up to seventy (70) miles an hour and reached lengths as close as one car between the vehicles.  *Id.* The chase ended when one police car bumped the stolen vehicle, causing the driver to hit his head on the steering wheel and pass out.  *Id.*  The stolen car then spun out of control and collided with two (2) other cars, one (1) of which was propelled into the plaintiff, a bystander on the sidewalk, who was severely injured as a result thereof.  *Id.* Even in a case where the injured plaintiff was not at all involved in the wrongdoing, the Court declined to find that the officer violated any substantive due process rights.

11

plaintiff only showed that the officers' "intent was to do their job as law enforcement officers, not to cause injury." *Id.*

So, too, here, the Court must follow the guidance of the Supreme Court and the Third Circuit and analyze whether the Plaintiff's allegations shock the conscience under the intent to cause harm standard. Accepting the allegations in Plaintiff's Complaint as true, Officer Wiegand began following Plaintiff's vehicle, though Plaintiff had done nothing wrong. However, Officer Wiegand's patrol lights only came on after Plaintiff failed to stop at a traffic light. Am. Compl. ¶¶ 4-6. Despite seeing the police lights, Plaintiff admits that he kept driving away from Officer Wiegand. Am. Compl. ¶¶ 9-11. In fact, Plaintiff continued to try to evade Officer Wiegand for over half an hour. Am. Compl. ¶20.

Though Plaintiff appears to suggest that the pursuit never should have begun in the first place because Plaintiff allegedly was not doing anything wrong before he went through the traffic signal, an officer's refusal to call off a chase is insufficient to trigger a substantive due process claim. *See Lewis*, 523 U.S. at 855; *Koreny*, 2018 WL 1141513, at *8 ("The Supreme Court has held on multiple occasions that the decision to engage in flight and to ignore police warnings to stop causing risk to innocent bystanders results, not from the pursuit by law enforcement, but from the fleeing suspect intentionally placing himself and others in danger by unlawfully engaging in reckless flight."). In fact, the Supreme Court in *Scott* directly addressed this issue, albeit in its Fourth Amendment reasonableness analysis for seizure, and noted:

> But wait, says respondent: Couldn't the innocent public equally have been protected, and the tragic accident entirely avoided, if the police had simply ceased their pursuit? We think the police need not have taken that chance and hoped for the best. Whereas [the officer]'s action—ramming respondent off the road—was *certain* to eliminate the risk that respondent posed to the public, ceasing pursuit was not. First of all, there would have been no way to convey convincingly to respondent that the chase was off, and that he was free to go. Had respondent looked in his rearview mirror and seen the police cars deactivate their flashing lights and turn around, he would have had no idea whether they

were truly letting him get away, or simply devising a new strategy for capture.  Perhaps the police knew a shortcut he didn't know, and would reappear down the road to intercept him; or perhaps they were setting up a roadblock in his path.  Given such uncertainty, respondent might have been just as likely to respond by continuing to drive recklessly as by slowing down and wiping his brow.

Second, we are loath to lay down a rule requiring the police to allow fleeing suspects to get away whenever they drive *so recklessly* that they put other people's lives in danger. It is obvious the perverse incentives such a rule would create: Every fleeing motorist would know that escape is within his grasp, if only he accelerates to 90 miles per hour, crosses the double-yellow line a few times, and runs a few red lights.  The Constitution assuredly does not impose this invitation to impunity-earned-by-recklessness.

550 U.S. at 385-86.

Not only was Plaintiff, himself, the catalyst for the continuation of the police pursuit, but also the conditions in *Lewis* and *Davis* were far more egregious than the facts before the Court today and still no substantive due process violation was found.  As stated by the District Court in *Koreny*:

If the conduct in *Lewis* involving police in a cruiser chasing a motorcycle at dangerous speeds and driving dangerously close to the motorcycle with a teenage passenger on the back for a traffic violation and continuing the pursuit at breakneck speeds through residential neighborhoods with the officer following from a dangerously close distance, all done in violation of police policy, and the conduct in *Davis* involving the intentional ramming of a pursued vehicle in violation of a general order do not constitute "conscience shocking" behavior or evidence an intent to harm not related to objective of arrest by the officer, then [Plaintiff]'s claims necessarily cannot be plausible under substantive due process.

2018 WL 1141513, at *9.  Here, there were no other noted drivers or bystanders on the road, and Plaintiff experienced no actual injury from Officer Wiegand's pursuit.  Though the Court recognizes that the road conditions were difficult on the night in question, such, alone, is insufficient to suggest that Officer Wiegand intended to harm Plaintiff.  Without any proof that Officer Wiegand's intent was to do anything more than his job, Plaintiff cannot successfully claim a substantive due process violation.

As seemingly further evidence to suggest Officer Wiegand's intent, Plaintiff states that Officer Wiegand violated East Lampeter Township's Vehicle Pursuit Policy.  Resp. 16; *see* Pursuit Policy, attached to Am. Compl. as Exhibit A (hereinafter "Ex. A").  Specifically, Plaintiff states the following policy violations: (1) Plaintiff committed no violations prior to the pursuit, but Officer Wiegand coerced probable cause to stop his vehicle;[8] (2) Officer Wiegand was asked multiple times by dispatch the reason for his pursuit;[9] (3) because Plaintiff was not committing any infraction prior to the pursuit, the potential for harm to others was non-existent;[10] (4) the road conditions on the night in question made the pursuit, itself unsafe, and Officer Wiegand ignored his supervisors advising him of this;[11] (5) Officer Wiegand was driving an unmarked Dodge Charger with tinted windows and no other decal to suggest it was the car of a police officer;[12] (6) the time of the pursuit was after midnight, during a rain and snow storm, on dark, rural backroads;[13] (7) Officer Wiegand's level of knowledge of the area where the pursuit ensued is unclear;[14] (8) the speed of the pursuit ranged from 10-65 mph;[15] (9) Plaintiff claims to have begun the pursuit initially on Lincoln Highway but quickly ended up on an unknown backroad;[16] (10) Officer Wiegand identified Plaintiff's vehicle information in minutes and could have

---

[8] Plaintiff appears to suggest that this violates East Lampeter's policy that "high speed pursuits [should be limited] to those situations in which the individual pursued poses no greater threat to the safety of any persons than that he/she posed prior to the pursuit or if the threat level is increased then the situation must involve a serious offense in which the use of force is authorized."  Ex. A at 30.

[9] Plaintiff fails to explain, and this Court fails to see, which policy this allegedly violates.

[10] As criteria of what an officer should consider in deciding whether to pursue a fleeing vehicle, the policy notes that this includes: "[t]he seriousness of the offense committed or believed committed" and "[t]he potential for harm to others if the fleeing individual escapes."  Ex. A at 31.

[11] Criteria of what officers should consider in deciding whether to pursue includes "[r]oad, weather, traffic and other environmental conditions."  Ex. A at 32.

[12] Another criteria for pursuit consideration is the "[p]olice vehicle type and condition."  Ex. A at 32.

[13] Officers should consider the "[t]ime of day, visibility, and illumination" in determining to pursue.  Ex. A at 32.

[14] Officers should consider their "familiarity...with the pursuit location" in deciding to pursue.  Ex. A at 32.

[15] Considerations for pursuit also include the "[s]peed of the vehicles involved in pursuit."  Ex. A at 32.

[16] Officers should consider the "[l]ocation of pursuit including intersections, residential areas or school zones."  Ex. A at 32.

terminated the pursuit without repercussions;[17] (11) Officer Wiegand refused orders in ignoring

directions to "back off" and not contact Plaintiff's vehicle;[18] (12) Officer Wiegand was assisted

by multiple police vehicles, both marked and unmarked, from at least two (2) separate units;[19]

(13) Officer Wiegand refused to relinquish pursuit, despite him being in an unmarked police

vehicle;[20] (14) despite having Plaintiff's identifying information, Officer Wiegand did not

relinquish pursuit;[21] (15) Officer Wiegand's reason for pursuit—an alleged equipment

violation—did not outweigh the danger of terminating the pursuit because the pursuit, itself,

caused much danger;[22] (16) neither Officer Wiegand or the other officers in the J1-22 vehicle

exited their cars when acting jointly to box-in and block Plaintiff's car;[23] (17) Officer Wiegand

and J1-22 completely blocked the road, leaving it impossible for Plaintiff to avoid collision;[24]

(18) it is not clear how officers should enact rolling/moving roadblocks, so Plaintiff alleges this

---

[17] The "[l]ikelihood of successful apprehension of fleeing subject" is another criteria for pursuit consideration.  Ex. A at 32.

[18] "Once an officer decides to pursue, the officer shall announce on the radio, as soon as possible and prudent, that he/she is in pursuit and provide to the dispatcher and other units the following information: (1) [l]ocation and description of travel; (2) [d]escription of pursued vehicle and occupant(s); (3) [r]eason for the pursuit; and (4) [i]nformation which may aid in apprehension of the subject."  Ex. A at 32.  "After pursuit is announced: (1) [a]ll non-emergency radio transmission shall cease; (2) Shift Supervisor should determine whether or not the pursuit shall be allowed to continue; (3) [i]f the Shift Supervisor is not available or is involved in the pursuit, then it is the responsibility of the pursuing officer to review the circumstances of the pursuit and determine whether or not to continue the pursuit."  Ex. A at 32.

[19] "The active pursuit shall normally consist of not more than two units: the primary unit and one backup unit.  Only the ranking officer who is available and on duty may authorize units in addition to that limit as may be appropriate or necessary to conduct an effective pursuit and ensure the safety of officers and the general public."  Ex. A at 33.

[20] "Whenever an officer in an unmarked emergency vehicle is engaged in a motor vehicle pursuit, the officer in the unmarked emergency vehicle shall relinquish the pursuit to an officer in a marked emergency vehicle as soon as prudent and possible."  Ex. A at 33.

[21] "Pursuits will be terminated when...[t]he suspect's identity has been established or other identifying data has been obtained that later apprehension is probable and there is no longer any need for immediate apprehension."  Ex. A at 34-35.

[22] "Pursuits will be terminated when...[t]he pursuing officer, Shift Supervisor, Officer in Charge, or other authorized officer determines that the pursuit should be terminated because there is a clear and unreasonable danger to the officer or other users of the highway that outweighs the necessity for immediate apprehension."  Ex. A at 34.

[23] "Roadblocks, when permitted, should also be authorized by a Shift Supervisor, Officer in Charge, or other authorized officer, if available and should...[h]ave no one in any vehicle that is being used as an obstruction in the roadblock."  Ex. A at 35.

[24] Roadblocks should "[n]ot completely block the road.  Police vehicles used in the road block should be placed at a 45 degree angle to the road and should face away from the flow of traffic.  This allows the officer to use the vehicle to continue pursuit if necessary and if the Reckless Evader evades the roadblock."  Ex. A at 35.

is unconstitutional;[25] (19) Officer Wiegand conspired to make contact with Plaintiff's vehicle;[26] and (20) Officer Wiegand made inaccurate reports regarding the pursuit, and East Lampeter Township did not pursue any officer misconduct as a result thereof.[27]  Resp. 20-31.

Though the Court recognizes that, assuming the allegations in Plaintiff's Amended Complaint are true, Officer Wiegand's pursuit may have violated multiple of East Lampeter Township's policies, Plaintiff is, effectively, asking the Court to elevate departmental policy to a federal constitutional standard.  Plaintiff's argument is not novel, as the plaintiffs in both *Lewis* and *Davis* also raised these concerns; however, both the Supreme Court and Third Circuit determined this was inadequate to prove intent.  *See Davis*, 190 F.3d at 180 ("*Lewis*...squarely refutes plaintiff's contention that the officers' violation of police department regulations, which might be probative of recklessness or conscious disregard of plaintiff's safety, suffices to meet the shocks-the-conscience test under the due process clause.").  Because this Court must follow the guidance of the Third Circuit and United States Supreme Court, Plaintiff's alleged violations of departmental policies cannot suffice to show Officer Wiegand intended to harm Plaintiff.

As Plaintiff's Amended Complaint is void of any plausible allegation that Officer Wiegand's intent was to cause harm unrelated to the legitimate object of arrest, he has failed to state sufficient conduct to "shock the conscience" for a substantive due process claim.

---

[25] "Rolling/moving roadblocks are permitted only in extraordinary situations and must be authorized by the Shift Supervisor."  Ex. A at 36.

[26] "Unless deadly force is permitted to be used, no police vehicle should make contact with or force the pursued vehicle off the roadway."  Ex. A at 36.

[27] A General Report form will be completed by the pursuing officer for all motor vehicle pursuits and shall include: (1) [r]eason the pursuit was initiated; (2) injuries of police officers/motorists/pedestrians...(9) [d]escription of damage to property and any vehicles, including police vehicles, during the pursuit; (10) [a] list of pursuit-related offenses with which fleeing individual or individuals were charged."  Ex. A at 36-37.  "An analysis and critique of each pursuit to specifically determine compliance with this policy and procedure will be completed by staff review and findings reported to the Chief of Police for final review."  Ex. A at 37.

Accordingly, Count I of Plaintiff's Amended Complaint as it relates to Officer Wiegand and any due process violations must be dismissed.

### B. Plaintiff's Eighth Amendment Violations against Officer Wiegand (Count I)

In addition to allegations of due process violations, Count I of Plaintiff's Amended Complaint mentions violations of Plaintiff's Eighth Amendment rights.  *See* Am. Compl., Count I.  Though Plaintiff's allegation remains unspecified, as Plaintiff fails to explain this issue at all in his Response, Defendants interpreted this claim to challenge the police pursuit and excessive force he was allegedly subjected to under the Eighth Amendment.  Mot. 30.  Because Plaintiff does not clarify his Eighth Amendment allegation to apply to something else, the Court will follow Defendants' interpretation in analyzing the issue.

The Eighth Amendment reads that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."  U.S. Const. amend. VIII.  It has been interpreted "to limit the power of those entrusted with the criminal-law function of government...and [works] to protect those convicted of crimes."  *Ingraham v. Wright*, 430 U.S. 651, 664 (1977).  "[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until *after it has secured a formal adjudication of guilt* in accordance with due process of law."  *Id.* at 671 n.40 (emphasis added).  "Where the State seeks to impose punishment without such adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment."  *Id.  See Palma v. Atlantic Cnty.*, 53 F. Supp. 2d 743, 754 (D.N.J. 1999) ("[T]o the extent that [the plaintiff] seeks to allege a § 1983 claim arising out of Defendants' actions prior to his conviction, [he] fails to state a cognizable claim under the Eighth Amendment.").

17

Here, Plaintiff fails to explain, and this Court fails to see, how he has been subjected to any cruel and unusual punishment *after* his conviction.  Without such explanation, his Eighth Amendment claim must fail.  Accordingly, Count I as it relates to any alleged Eighth Amendment violations by Officer Wiegand is dismissed.

### C.  Plaintiff's Failure to Train Claim against East Lampeter Township (Count IV)

In addition to claims brought against Officer Wiegand, Plaintiff also states that "Defendant, East Lampeter Township, acquiesced in their police officer's misconduct by failing to adequately train Officer Ryan Wiegand as to lawful use of force policies, vehicle pursuit policies, and arrest procedure," causing a violation of Plaintiff's civil rights under 42 U.S.C. § 1983.  Am. Compl., Count IV.  Plaintiff describes East Lampeter Township as a "municipality whose responsibility is to provide adequate training and valid certifications for their police officers."  Am. Compl., Defs., ¶ 8.[28]

Though a municipality may be liable under § 1983 for its '*own* illegal acts,' it may not be held vicariously liable for its employee's actions.  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original)).  "Ordinarily, in order to hold a municipality such as [East Lampeter Township] liable under § 1983, there first must be a constitutional injury caused by its officers."  *Koreny*, 2018 WL 1141513, at *15 (citing *City of Los Angeles v. Heller*, 475 U.S. 796 (1986)).  "For claims involving police officers, the Supreme Court has held that the failure to train 'serve[s] as [a] basis for § 1983 liability only where [it]...amounts to deliberate indifference to the rights of persons with whom the police come into contact.'"  *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989)).  "A plaintiff sufficiently pleads deliberate

---

[28] Notably, these are the only times Plaintiff even mentions Defendant East Lampeter Township throughout his entire Amended Complaint.

indifference by showing that '(1) municipal policymakers know that employees will confront a particular situation[,] (2) the situation involves a difficult choice or a history of mishandling[,] and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.'" *Id.* (quoting *Doe v. Luzerne Cnty.*, 660 F.3d 169, 180 (3d Cir. 2011)).  To be clear, "'deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quoting *Bd. of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 410 (1997)).  "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Id.*

In order to successfully state a § 1983 violation based on failure to train, this typically requires "[a] pattern of similar constitutional violations by untrained employees...to demonstrate deliberate indifference[.]" *Id.* at 62.  Absent prior instances, "decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.*  In some instances, however, a single incident will be sufficient when a plaintiff shows that the alleged failure to train would likely result in an obvious constitutional violation. *Schott v. Upper Chester Twp.*, No. 22-CV-230, 2022 WL 3371610, at *3 (E.D. Pa. Aug. 16, 2022).

The Third Circuit has noted:

> Establishing municipal liability on a failure to train claim under § 1983 is difficult.  A plaintiff pressing a § 1983 claim must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific train cam reasonably be said to reflect a deliberate indifference to...the alleged constitutional deprivations.

*Reitz v. Cnty. of Bucks*, 125 F.3d 139, 145 (3d Cir. 1997).  Importantly, a municipality cannot be held liable "if the plaintiff shows only that officers could have been better trained,

supervised or disciplined in general." *Schott*, 2022 WL 3371610, at *3 (citing *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 226 (3d Cir. 2014)). "[A]dequately trained officers occasionally make mistakes; the fact that they do so says little about the training program or the legal basis for holding the city liable." *Canton*, 489 U.S. at 391. "Rather, the training, supervisory or disciplinary shortcomings must be closely related to and have caused the alleged constitutional violation." *Schott*, 2022 WL 3371610, at *3.

Here, Plaintiff's claim that "Defendant, East Lampeter Township, acquiesced in their police officer's misconduct by failing to adequately train Officer Ryan Wiegand as to lawful use of force policies, vehicle pursuit policies, and arrest procedure" fails because it is nothing more than a "conclusory, bare-bones assertion[]." Am. Compl., Count IV; *Schott*, 2022 WL 3371610, at *3. *See Fowler*, 578 F.3d at 210. Though he points to instances where the officers may have departed from East Lampeter's Police Pursuit policy, he appears to suggest that this creates "the requisite affirmative link between policy and a violation of [his] constitutional right." *Koreny*, 2018 WL 1141513, at *16. "Under [his] theory[,] a violation of a constitutional right would occur any time a person was injured and a policy was not followed by police." *Id.* However, the Supreme Court in *City of Oklahoma City v. Tuttle* warned against such a conflation, especially when only a single incident is described, and advised that "considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation." 471 U.S. 808, 823-24 (1985).

Here, Plaintiff only mentions East Lampeter Township twice throughout the course of his entire Amended Complaint and otherwise just attaches the Township's Police Pursuit Policies that was *already put in place before* the relevant incident occurred. Not only does he fail to

establish any constitutional violation that resulted from the police pursuit, which the Court has already discussed at length, but he also does not provide *any* information regarding the Township's use of force and arrest policies or previous incidents to suggest that the Township had notice to meet the deliberate indifference standard.  *See Koreny*, 2018 WL 1141513, at *17 (the plaintiff's "complaint points to nothing more than there were policies that, if followed, would have prevented the [incident]..., and because the vehicle accident occurred, it must have resulted from inadequate training...Her complaint, at most, states a claim sounding in negligence, which is insufficient to state a plausible claim for violation of her substantive due process rights by [the municipality].").

Without more, Plaintiff's failure to train claim against Defendant East Lampeter Township fails to achieve the requisite pleading standard.  Accordingly, Moving Defendants' Motion as to Count IV of Plaintiff's Amended Complaint must be granted.

## VI.   CONCLUSION

For the reasons set forth above, Moving Defendants' Partial Motion to Dismiss is granted. Accordingly, Count I relating to the police pursuit and any Eight Amendment violations against Officer Wiegand and Count IV of Plaintiff's Amended Complaint are dismissed without prejudice.

An appropriate Order follows.

BY THE COURT:

/s/ C. Darnell Jones, II J.
Judge C. Darnell Jones, II